<table>
<tr><td colspan="2" align="center">IN THE UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF UTAH</td></tr>
<tr><td>

ROUTE APP, INC.,

        Plaintiff,

v.

MARC HEUBERGER, ELEVATIONE, and NAVIDIUM APP,

        Defendants.

</td><td>

MEMORANDUM DECISION AND ORDER DENYING DEFENDANT MARC HEUBERGER'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Case No. 2:22-CV-291-TS-JCB

District Judge Ted Stewart

</td></tr>
</table>

This matter is before the Court on Defendant Marc Heuberger's Motion to Dismiss for Lack of Jurisdiction. For the following reasons, the Court will deny the Motion.

## I.    BACKGROUND

Unless stated otherwise, the following facts are taken from Plaintiff Route App, Inc.'s ("Plaintiff" or "Route") Complaint and are presumed true for the purposes of this Motion.

Route is a package tracking company that provides post-purchase services and products to e-commerce merchants.[1] Shipping insurance, also referred to as "Route Protect," is among Route's primary products.[2] Merchants may access Route Protect through various third-party marketplace applications for e-commerce, like the Shopify App, or Route may directly seek out prospective merchant partners.[3] However, to facilitate use of its products, Route is required to

---

[1] Docket No. 2 ¶ 14.

[2] *Id.* ¶ 17 (redacted).

[3] *Id.* ¶ 19.

give merchants access to its confidential and proprietary information and trade secrets.[4] For this reason, merchant partners must agree to Route's Terms and Conditions.[5]

In October 2020, ElevatiONE, an e-commerce cosmetics company, became a Route merchant partner[6] by and through Marc Heuberger, who purchased Route Protect on behalf of ElevatiONE.[7] Route alleges that Heuberger is the founder of ElevatiONE, but in his Motion to Dismiss for Lack of Jurisdiction Heuberger states that ElevatiONE is a London-based company with several owners and founders, none of whom are Heuberger.[8]

In January 2021, ElevatiONE and Heuberger ended their relationship with Route and decided to "self-insure."[9] Heuberger then created the Navidium App in December 2021.[10] Navidium offers e-commerce merchants a widget that enables merchants to charge their customers a premium to cover shipping issues.[11]

Route claims that Navidium is "a copy-cat, knock-off version" of its product. Route also alleges that Heuberger made disparaging, false, and misleading statements about Route to divert its current and prospective merchant partners.[12] On April 28, 2022, Route commenced this action against Heuberger, ElevatiONE, and Navidium App (collectively, "Defendants"), alleging that they unlawfully copied Route's confidential and proprietary information and trade secrets in

---

[4] *Id.* ¶ 23.
[5] *Id.* ¶ 24.
[6] *Id.* ¶ 34.
[7] *Id.* ¶¶ 35; *see* Docket No. 29 ¶ 3.
[8] Docket No. 2 ¶¶ 7, 34; Docket No. 25 at 4 n.21.
[9] Docket No. 2 ¶ 39.
[10] *Id.* ¶ 41.
[11] *Id.* ¶ 42.
[12] *Id.* ¶¶ 41, 61–70.

violation of Route's Terms and Conditions. Route brings claims for breach of contract, commercial disparagement, intentional tortious interference with contractual relations, misappropriation of trade secrets, and contributory trademark infringement against Defendants.[13] Now before the Court is Heuberger's Motion to Dismiss for Lack of Jurisdiction.

## II. LEGAL STANDARD

Heuberger moves to dismiss under Fed. R. Civ. P. 12(b)(2) and 12(b)(5). Because Route filed a certificate of service on Heuberger on June 8, 2022, Heuberger's Rule 12(b)(5) argument for insufficient service of process is moot.[14] The Court will limit its analysis to whether it has personal jurisdiction over Heuberger pursuant to Rule 12(b)(2).

Under Rule 12(b)(2), the plaintiff bears the burden of showing that the Court has personal jurisdiction over each defendant.[15] Where, as here, there has been no evidentiary hearing,[16] the plaintiff need only make a *prima facie* showing of personal jurisdiction.[17] If the defendant challenges the jurisdictional allegations, the plaintiff must support those allegations by competent proof of the supporting facts.[18] In evaluating the plaintiff's showing, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the

---

[13] Docket No. 2.

[14] *See* Docket No. 38.

[15] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069–70 (10th Cir. 2008)).

[16] Neither party has moved for an evidentiary hearing so the Court may decide the motion on the pleadings (with attachments) and affidavits. *Id.*; Fed. R. Civ. P. 12(i).

[17] *Shrader*, 633 F.3d at 1239; *see Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (internal citation omitted).

[18] *Pytlik v. Pro'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989) (internal citation omitted).

plaintiff's favor, and the plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party."[19]

### III. DISCUSSION

Route asserts personal jurisdiction under two theories. First, Route asserts that Heuberger's minimum contacts with Utah are sufficient for personal jurisdiction. Second, Route argues that Heuberger consented to jurisdiction by agreeing to its Terms and Conditions, which contained a forum selection clause.[20] The Court agrees that Heuberger has consented to jurisdiction through the forum selection clause. Because "[f]orum selection clauses are typically viewed as *prima facie* establishment of personal jurisdiction,"[21] the Court "need not consider . . . constitutional argument[s] as to personal jurisdiction."[22]

A. Forum Selection Clause

A party may consent to personal jurisdiction and venue by agreeing to a forum selection clause contained in a contract.[23] A forum selection clause located in "a form contract[,] the terms of which are not subject to negotiation," is generally enforceable.[24]

Whether a forum selection clause is valid and enforceable is an issue of contract formation informed by substantive state law. Here, both parties apply Delaware law[25] where "a

---

[19] *Wenz*, 55 F.3d at 1505 (internal quotation marks and citations omitted).

[20] Docket No. 21 at 5; Docket No. 29 at 15–21.

[21] *Waste Servs., LLC v. Red Oak Sanitation, Inc.*, No. 2:08-CV-417-DS, 2008 WL 2856459, at *1 (D. Utah July 23, 2008) (emphasis added).

[22] *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589 (1991).

[23] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).

[24] *Carnival Cruise Lines, Inc.*, 499 U.S. at 593.

[25] Under Route's Terms and Conditions, the parties agreed that any legal action will be governed by Delaware law. *See* Docket No. 2 at 61–63.

4

contract comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms."[26] Even in the age of the Internet, mutual manifestation of assent is essential in contract formation.[27] Basic contract law principles indicate that consumers are bound by an online agreement if they have reasonable notice of the terms and affirmatively manifest assent to those terms.

Courts have generally recognized four types of online consumer agreements: clickwrap, scrollwrap, sign-in wrap, and browsewrap. Clickwrap agreements require a user to agree to the terms and conditions before using a website or application—for example, clicking a box stating "I agree" to the terms of use are generally enforceable agreements.[28] Scrollwrap agreements require users to scroll through an online agreement and then click "I agree" to the terms.[29] With sign-in-wrap agreements, users generally consent to the terms when they sign into an account or sign up for use of the site's services.[30] With browsewrap agreements, the terms are documented somewhere on a retailer's website and purported to apply to a user by virtue of accessing that

---

[26] *Intellisource Grp., Inc. v. Williams*, No. C.A. 98–57–SLR, 1999 WL 615114, at *4 (D. Del. Aug. 11, 1999) (*quoting Tel. & Data Sys., Inc. v. Eastex Cellular L.P.*, Civ. A. No. 12888, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993) (internal quotation marks omitted)).

[27] *Register.com, Inc. v. Verio Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."); *see also Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248 (10th Cir. 2012); *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Treiber & Straub, Inc. v. U.P.S.*, 474 F.3d 379, 385 (7th Cir. 2007).

[28] *Hancock*, 701 F.3d at 1257–58 (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 33–34 (2nd Cir. 2002)).

[29] *Id*.

[30] *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 400–01 (E.D.N.Y. 2015) (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012)) (finding that the agreement was a hybrid of browsewrap and clickwrap).

website or platform.[31] To determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application.

Here, the type of agreement that Heuberger encountered is a sign-in-wrap agreement. According to Heuberger's declaration, to access Route App's products, users must create an account where they are prompted to enter an email address, name, phone number, and confirm a password.[32] In small print below it states: "Already have an account?" and then provides a link to "LOG IN here."[33] Directly below that is text stating "By continuing, you are agreeing to our Terms of Service and Privacy Policy."[34] The words "Terms of Service" are underlined in blue font and hyperlink to a separate webpage listing Route's Terms and Conditions.[35] Within the Terms and Conditions is a forum selection clause requiring that "all claims and disputes arising out of or relating to this Agreement or the Services . . . be litigated exclusively in the state courts located in Salt Lake City, Utah or federal courts located in the District of Utah"[36] and the following provision:

> If you accept or agree to these Terms and Conditions of Use on behalf of a company or other legal entity, you represent and warrant that you have the authority to bind that company or other legal entity to these Terms and Conditions of Use and, in such event, "you" and "your" will refer and apply to that company or other legal entity in addition to you.[37]

---

[31] *Id.* at 395 (citing *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009)).

[32] Docket No. 25-1 ¶ 15.

[33] *Id.*

[34] *Id.*; Docket No. 29 at 10.

[35] Docket No. 25-1 ¶ 16.

[36] Docket No. 2 at 61, 79.

[37] *Id.* at 50, 66.

At the bottom of the page is a button to "Continue."[38]

Heuberger does not deny that he clicked "Continue" to create an account, but he argues that he was not sufficiently noticed that by doing so he was purportedly agreeing to the Terms and Conditions or that his use of the Route App on behalf of ElevatiONE would purportedly bind him as well.[39] Heuberger asserts that because he was not required to affirmatively click on the "Terms of Service" hyperlink and review the "Terms and Conditions," he was not sufficiently noticed of the terms.[40] Heuberger further contends that the "Terms of Service" hyperlink is in small font and located far away from the "Continue" button.[41] For these reasons, Heuberger argues that the Terms of Conditions are unenforceable.

By contrast, Route argues that courts have found that sign-in-wrap agreements are generally enforceable where the hyperlinked Terms and Conditions are next to the only button that will allow the user to continue use of the website.[42] The websites in these cases explicitly tell the user that by choosing to sign up for the service, the user is "agreeing" to the hyperlinked terms.

---

[38] Docket No. 25-1 ¶¶ 13, 16.

[39] *Id.* ¶¶ 17–18.

[40] *Id.* ¶ 16.

[41] *Id.*

[42] *Berkson*, 97 F. Supp.3d at 401 (citing as examples *Crawford v. Beachbody, LLC*, No. 14-CV-1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (finding the forum selection clause binding where consumer clicked a "Place Order" button and above the button was hyperlinked statement subjecting the user to the website's "terms and conditions"); *Starke v. Gilt Groupe., Inc.*, No. 13-CV-5497, 2014 WL 1652225, at *2–3 (S.D.N.Y. Apr. 24, 2014) (finding the arbitration clause in "terms of use" binding where consumer clicked a "Shop Now" button next to the hyperlinked statement: "the consumer will become a Gilt member and agrees to be bound by the 'Terms of Membership'"); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011) (finding the arbitration clause enforceable where user clicked an "Accept," button and below was a statement in small grey font stating that clicking the button meant accepting the hyperlinked "terms of service")).

Here, the Court finds that the placement and design of the statement "By continuing, you are agreeing to our Terms of Service and Privacy Policy" sufficiently notices users that by choosing to "Continue," the user is "agreeing" to the hyperlinked terms. Route's "Create Your Account" webpage uses a simple, uncluttered design with five boxes for users to provide their personal information. Directly below these boxes are the following messages: "Already have an account?" and then provides a link to "LOG IN here."[43] Further below that is text stating "By continuing, you are agreeing to our Terms of Service and Privacy Policy."[44] The "Terms of Service" and "Privacy Policy" appear in blue font and are hyperlinked to Route's Terms and Conditions. Further below that message is the "Continue" button. The entire page appears on a single screen and does not require the user to scroll beyond what is already visible to see the Terms of Service.

In *Meyer v. Uber Technologies, Inc.*[45] and *Selden v. Airbnb, Inc.*,[46] circuits courts held that similar webpage layouts put users on reasonable notice of the terms thus rendering the agreements enforceable. In *Meyer*, the Second Circuit held that Uber's online agreement provided the plaintiff with reasonable notice of the contract terms when it provided a warning stating "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY."[47] The court held that the terms were clear and conspicuous where the hyperlinked

---

[43] Docket No. 25-1 ¶ 15.

[44] *Id.*; Docket No. 29 at 10.

[45] 868 F.3d 66 (2nd Cir. 2017).

[46] 4 F.4th 148, 156–57 (D.C. Cir. 2021).

[47] *Meyer*, 868 F.3d at 78.

8

"TERMS OF SERVICE & PRIVACY POLICY" was underlined and in blue, and the hyperlink appeared in close proximity to the "REGISTER" button.[48]

In *Selden*, the D.C. Circuit Court upheld an online agreement where the notice was "unobscured by other visual elements."[49] In that case, the court concluded that Airbnb's sign-up screen used a simple design which stated: "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms."[50] These terms and policies appeared in red text against a white background, were hyperlinked to the full policies, and appeared on a single screen for an iPhone user.[51] Based on the webpage design, the D.C. Circuit Court held that the webpage text as conspicuous and thus sufficiently noticed plaintiff of Airbnb's terms.

Heuberger contends that the "Terms of Service" hyperlink appears in too small of a font to put him on reasonable notice that he was agreeing to the Terms and Conditions. However, in *Meyer* the Second Circuit stated, "[a]lthough the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined."[52] Here, the Court finds that the above-described blue font, while small, draws sufficient attention to the "Terms of Service" hyperlink to put reasonable users, like Heuberger, on notice that by choosing to "Continue," the user will be subject to Route's terms.

Heuberger also argues that the "Terms of Service" hyperlink was not right next to the "Continue" button and, because of this distance, he lacked reasonable notice that he was agreeing

---

[48] *Id.* at 78–79.
[49] *Selden*, 4 F.4th at 157.
[50] *Id.* at 156.
[51] *Id.* at 155–56.
[52] *Meyer*, 868 F.3d at 78.

to the Terms and Conditions when he proceeded past the "Create Your Account" webpage. The Court finds this argument unpersuasive. In *Selden*, the court held that the "Continue" button and "Terms of Service" hyperlink were in close proximity, even if not directly next to the other, and visible on the same screen.[53] Similarly here, the Court finds that Route's "Continue" button was in close enough proximity to the "Terms of Service" hyperlink to sufficiently put Heuberger on reasonable notice of the terms.

Lastly, Heuberger claims that the phrase "Terms and Conditions" is not referenced on the webpage, only "Terms of Service." Route responds arguing that the phrases "Terms of Service" and "Terms of Conditions" are interchangeable phrases, but it does not direct this Court to any legal authority supporting such an assertion. Regardless, as discussed at length, the Court finds Route's webpage clear and conspicuous sufficient to give a reasonable user notice of its terms.

In support of his arguments, Heuberger references *Berkson v. Gogo LLC*,[54] wherein the court found the arbitration clause in Gogo, Inc's terms of use was part of an unenforceable sign-in-wrap agreement. In that case, the plaintiffs signed up and used Gogo's product a single time. When the plaintiffs signed up, they did not receive a confirmation email containing a hyperlink to the terms of use. Additionally, the court found that the hyperlink to the "terms of use" was not in large font, all caps, or in bold, or accessible from multiple locations on the webpage. Under these circumstances, the court found that the plaintiffs would have seen the terms of use hyperlink only once or a few times, thus rendering the arbitration clause in the terms of use unenforceable.

---

[53] *Selden*, 4 F.4th at 157 ("The buttons appeared in close proximity to the notice and on a single screen. A reasonable person would know that, by signing up, he would be agreeing to Airbnb's terms even if he used his Facebook account to sign up.").

[54] 97 F. Supp.3d 359 (E.D.N.Y. 2015).

Here, Heuberger was not emailed a confirmation with the Terms and Conditions or repeatedly told that he was consenting to the terms. However, as previously discussed, the design and content of Route's webpage compel this Court to find that Route provided reasonable notice of its terms to users like Heuberger. Moreover, Heuberger is an e-commerce consultant for ElevatiONE[55] and is the creator of the Navidium App which has its own hyperlinked Terms and Conditions on its webpage.[56] Thus, the Court finds that Heuberger is not a lay internet user, rather, he is a sophisticated e-commerce business person well-seasoned in how hyperlinks work. In *Salameno v. Gogo*,[57] the court stated that "in today's technologically driven society, it is reasonable to charge experienced users . . . with knowledge of how hyperlinks work and, by extension, how to access the terms" within.[58] Given Heuberger's experience in the e-commerce market, it is reasonable that Heuberger has sufficient knowledge and awareness of online form agreements, including sign-in-wrap agreements. For the foregoing reasons, the Court finds that Route's forum selection clause is enforceable.

Heuberger also argues that the forum selection clause is unconscionable. A forum selection clause is unconscionable if there is "an absence of meaningful choice and contract terms unreasonably favorable to one of the parties."[59] "A court must find that the party with superior bargaining power used [the contract] to take unfair advantage of his weaker

---

[55] Docket No. 25 at 2 n.1.

[56] *Id.* at 7–10; Docket No. 33 at 7.

[57] No. 16-CV-487, 2016 WL 4005783 (E.D.N.Y. July 25, 2016) (finding a combination of a clickwrap and sign-in-wrap agreement enforceable where sophisticated internet users were repeatedly told they were consenting to the terms of use when they signed into a website).

[58] *Id.* at *6.

[59] *Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978).

11

counterpart."[60] "Whether a contract is unconscionable is determined at the time it was made," and "[t]he outcome turns on the totality of the circumstances."[61]

Heuberger argues that Route's Terms and Conditions are a substantively and procedurally unconscionable. Under Delaware law, contract is substantively unconscionable if "a bargain on terms [is] so extreme . . . according to the mores and business practices of the time and place."[62] Courts use the following factors to determine substantive unconscionability:

> (1) A significant cost-price disparity or excessive price; (2) the denial of basic rights and remedies; (3) penalty clauses; (4) the placement of disadvantageous clauses in inconspicuous locations or among fine print trivia; (5) the phrasing of disadvantageous clauses in confusing language or in a manner that obscures the problems they raise; and (6) an overall imbalance in the obligations and rights imposed by the bargain.[63]

Those factors relevant here do not support a finding of substantive unconscionability. Specifically, and as previously discussed, the Court does not find that the placement of Route's Terms and Conditions were placed or phrased disadvantageously. Additionally, as a sophisticated internet user with knowledge of how hyperlinks work, the Court does not find an overall imbalance in the obligations and rights imposed by Route's terms.

The Court also does not find that Route's Terms and Conditions are procedurally unconscionable. A contract is procedurally unconscionable if "seemingly lopsided terms might have resulted from arms'–length bargaining."[64] Courts look to the following factors to determine procedural unconscionability:

---

[60] *Graham v. State Farm Mut. Auto. Inc. Co.*, 565 A.2d 908, 912 (Del. 1989).

[61] *James v. Nat'l Fin., LLC*, 132 A.3d 799, 814 (Del. Ch. 2016) (internal quotation marks and citations omitted).

[62] *Id.* at 815 (internal quotation marks and citation omitted).

[63] *Id.* at 815–16 (citing *Fritz v. Nationwide Mut. Ins. Co.*, Civ. A. No. 1369, 1990 WL 186448, at *4–5 (Del. Ch. Nov. 26, 1990)).

[64] *Id.* at 815.

> (1) inequality of bargaining or economic power; (2) exploitation of the underprivileged, unsophisticated, uneducated, and illiterate; (3) the use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry-wide standards offered on a take it or leave it basis to the party in a weaker economic position; and (4) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose, and actual effect.[65]

Heuberger argues that as a billion-dollar company, Route took an unfair advantage over him by leaving him no choice but to accept Route's "take-it-or-leave-it offer."[66] However, as previously noted, Heuberger has sufficient experience in the e-commerce market to distinguish himself from lay internet users. Based on careful review of the record, the Court cannot find that Route took an unfair advantage over Heuberger to render the forum selection clause unconscionable.

B. Pendent Jurisdiction

The Court must consider whether it may exercise pendent personal jurisdiction over Route's remaining claims.

> Pendent personal jurisdiction . . . exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim. In essence, once a district court has personal jurisdiction over a defendant for one claim, it may "piggyback" onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction.[67]

Here, all of Route's claims arise out of the same nucleus of operative facts. Route's claims are based on alleged breach of its Terms and Conditions and unlawful solicitation of Route's current and prospective merchant partners. Thus, even assuming the Court lacks personal

---

[65] *Id.* at 826 (citing *Fritz*, 1990 WL 186448, at *4–5).

[66] Docket No. 25 at 15.

[67] *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002) (internal citations omitted).

jurisdiction over Heuberger for Route's remaining claims, the Court will exercise its discretion and assert jurisdiction over these claims.

## IV.     CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Dismiss for Lack of Jurisdiction (Docket No. 25) is DENIED.

DATED this 28th day of June, 2022.

BY THE COURT

_____
Ted Stewart
United States District Judge