Walter A. Romney, Jr. (7975)
CLYDE SNOW & SESSIONS
201 South Main Street, Suite 2200
Salt Lake City, UT 84111
Telephone/Facsimile: (801) 322-2516
war@ClydeSnow.com

Ellie J. Barragry, *pro hac vice*
FOX ROTHSCHILD LLP
Two22 Building, Suite 2000
222 South Ninth Street
Minneapolis, Minnesota 55402-3338
Telephone:   (612) 607-7000
Facsimile:   (612) 607-7100
ebarragry@foxrothschild.com

Richard I. Scharlat, *pro hac vice*
FOX ROTHSCHILD LLP
100 Park Avenue, 17th Floor
New York, NY  10178
Telephone:  (212) 878-7900
Facsimile:  (212) 692-0940
rscharlat@foxrothschild.com

***Attorneys for Defendant Marc Heuberger***

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROUTE APP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MARC HEUBERGER, ElevatiONE, and NAVIDIUM APP,<br><br>Defendants. | Case No. 2:22-CV-00291-TS-JCB<br><br>**DEFENDANT MARC HEUBERGER'S MOTION FOR JUDGMENT ON THE PLEADINGS (ORAL ARGUMENT REQUESTED)**<br><br>**District Judge Ted Stewart**<br>**Magistrate Judge Jared C. Bennett** |

## RELIEF SOUGHT AND GROUNDS FOR THE MOTION

Defendant Marc Heuberger ("Heuberger") seeks dismissal of all Plaintiff Route App, Inc.'s ("Route") claims against him pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (the "Motion"). Furthermore, pursuant to DUCivR 7-1(g), Heuberger requests oral argument on his Motion and asserts that there is good cause for do doing. Although the Court is well informed about this dispute, Heuberger requests a hearing so that he, through his counsel, may clarify any questions that the Court has regarding Heuberger's arguments, his case, and this impact of the result that he seeks from the Court.[1] Respectfully, Route's factual allegations, and the legal theories upon which they are founded, have been doomed from the start. It is time to resolve this matter before the parties incur the expense of discovery, only to confirm what the record demonstrated from the beginning—Route's attempt to bully a competitor into submission lacked any factual or legal support. Heuberger requests an opportunity to address the Court in person as part of his efforts to dismiss this case given that—even taking Route's allegations as true for the purposes of the Motion—Route fails to state a legally cognizable claim.

## FACTUAL BACKGROUND

### I.      The Relationship Between the Parties and Route's Terms and Conditions.

Heuberger is an eCommerce consultant who, at all relevant times, was working on

---

[1]     Dkt. 42, 65, 70.

behalf of the eCommerce company, ElevatiONE.[2] Route is a "package tracking company," offering customers "post-purchase services and products, including shipping insurance."[3] Via Route's App (the "App"), Route "offers its products and services to e-commerce merchants, who then incorporate the product into their online marketplaces for end-consumers to use."[4]

In October 2020, ElevatiONE became a user of the Route App.[5] As part of the App's installation process, Heuberger and ElevatiONE allegedly accepted and agreed to Route's Terms and Conditions ("T&C") when creating a user account.[6] The Complaint alleges that "[t]o use and implement Route's services, Route's merchant partners require access to Route's confidential and proprietary information and trade secrets, including, but not limited to, the design, specifications, components, functionality or operation, and payment terms and pricing of Route's products and services, as well as actual application code."[7]

The T&C contain several restrictive covenants, which Route alleges fall into three categories: (1) non-competition and non-solicitation; (2) prohibition on use of Route's

---

[2]   Dkt. 2 ¶¶ 7-8, 35.

[3]   *Id*. ¶ 14.

[4]   *Id*. ¶ 16.

[5]   *Id*. ¶ 34. The Complaint specifies that it was ElevatiONE, and not Heuberger, that became a merchant partner. *Id*.; *see also id*. ¶ 40 ("During the period in which ElevatiONE was a Route merchant partner, and shortly thereafter, Route's success and notoriety grew substantially.").

[6]   *Id*. ¶ 35.

[7]   *Id*. ¶ 23.

services to develop a competing entity; and (3) non-disparagement.[8] In relevant part,

Route's non-competition and non-solicitation covenants provide:

> At all times during the Term and thereafter for a period of twenty four (24) months, You and Your subsidiaries and affiliates covenant and agree that You shall not provide Shipping Protection of any kind to any party unless You or Your affiliates obtain all necessary and required licenses and permits for such offering from all relevant federal and state agencies and regulatory bodies.[9]

> At all times during the Term and thereafter for a period of twenty four (24) months, You will not for any reason, whether directly or indirectly, (i) solicit, recruit, or encourage any Route customer, employee, or consultant to reduce, alter, or terminate its relationship with Route or (ii) divert any potential Route customer away from Route.[10]

Route's restriction on use of services and development, which has no definite

duration, provides that:

> You are strictly prohibited from accessing and/or using the Services or any Content to develop, or have a third party develop, a product or service that is similar or competitive to the Services, including but not limited to any product or service that offers or makes available shipping insurance to its customers.[11]

Finally, Route's non-disparagement clause provides that, "[a]t all times during the

Term and thereafter, neither Party will, whether directly or indirectly, make any

disparaging, negative, or false or misleading statements with respect to the other Party."[12]

---

[8]   *Id.* ¶ 24; *see also* Dkt. 4 at 17-18.

[9]   Dkt. 2 at 69.

[10]   *Id.*

[11]   *Id.* at 52.

[12]   *Id.*

In January 2021, Heuberger and ElevatiONE ended their involvement with Route.[13] When Route asked what prompted the decision, Heuberger and ElevatiONE cited an unfavorable return on investment and dissatisfaction with Route's seven-day waiting period for processing shipping claims.[14] ElevatiONE also indicated that it could provide shipping protection in a manner that would better suit its needs.[15]

Almost a year after ElevatiONE and Heuberger ceased using the App, in December 2021, Heuberger launched Navidium.[16] As a "widget," Navidium is a technology offered to merchants to use in eCommerce marketplaces that allows the merchant to charge a fee—a fee that the merchant sets and collects directly—to guarantee shipment to end-consumers (which the merchant, not Navidium, handles itself).[17] As Route concedes, "[o]n the surface, Navidium looks and acts exactly like Route," but "there are *significant differences*, the most glaring being the role that Navidium plays, which is minimal."[18] "Unlike Route, Navidium does not offer actual insurance, nor is it licensed to do so."[19] "Nor does Navidium offer analyses or services regarding the amount of premium to charge to end-consumers, handle claims, *or provide any of the other*

---

[13]   *Id.* ¶ 39.

[14]   *Id.*

[15]   *Id.*

[16]   *Id.* ¶ 41 (Route's pleading misstates the date as December 2022).

[17]   *Id.* ¶ 42.

[18]   *Id.* ¶ 43 (emphasis added).

[19]   *Id.* ¶ 44.

*services that Route does*."[20] Route further highlights that "Navidium offers **merchants** the option of 'white-labeling' its shipping protection product by removing the Navidium name on their websites and replacing it with **whatever the merchant chooses**, such that the end user…cannot be certain the shipping product being used belongs to Navidium."[21]

Route alleges that in March 2022, Heuberger emailed four of Route's customers to persuade them to use the Navidium technology.[22] Route alleges that content was posted to Navidium's website stating that the Navidium team can help merchants switch from Route to Navidium.[23] Route alleges that Heuberger further used social media websites to market the benefits of the Navidium technology and explain how Navidium is materially distinguishable from Route's App, which Route concedes.[24]

Finally—and incredibly—in April 2022, a Route employee "set up a demo of the Navidium product with Heuberger" and recorded the demonstration.[25] This surreptitious recording occurred **after** Route served Heuberger with a cease-and-desist letter.[26] During the demo, Route alleges that "Heuberger echoed the same disparaging, false, and/or

---

[20]   *Id*. ¶ 45 (emphasis added).

[21]   *Id*. ¶ 48 (emphasis added).

[22]   *Id*. ¶¶ 63-66.

[23]   *Id*. ¶ 69.

[24]   *Id*. ¶¶ 43-45, 48, 70.

[25]   *Id*. ¶ 67.

[26]   *Id*.

misleading claims made in his emails" to Route's customers.[27] Route claims that all these advertisement and marketing efforts are defamatory.[28]

## II.     Route's Causes of Action.

Route asserts a claim for breaches of various unenforceable restrictive covenants in the T&C, an "interchangeable" defamation-related claim for commercial disparagement/trade libel/injurious falsehoods and defamation per se, tortious interference with contracts between Route and non-party eCommerce merchants, misappropriation of trade secrets under the Federal Defend Trade Secrets Act ("DTSA") and the Delaware Uniform Trade Secrets Act ("DUTSA"), and contributory trademark infringement under the Lanham Act.[29] For the reasons stated below, each of these claims should be dismissed under Rule 12(c).

## ARGUMENT AND AUTHORITIES

## I.     The Complaint Should be Dismissed Under Rule 12(c).

The standard of review for evaluating a Rule 12(c) motion is the same as a motion brought under Rule 12(b)(6).[30] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

---

[27]  *Id*. (emphasis added).

[28]  *Id*. ¶¶ 63-66, 120-27.

[29]  *Id*. ¶¶ 112-64.

[30]  *Prismview, LLC v. Old Dominion Freight Line, Inc.*, 2022 WL 103793, at *1 (D. Utah Jan. 11, 2022) (Stewart, J.); *see also Coates v. Wells Fargo Home Mortg., Inc.,* 2011 WL 3563005, at *2 (D. Utah Aug. 10, 2011) (Stewart, J.); *Holgers v. S. Salt Lake City*, 2011 WL 98488, at *3 (D. Utah Jan. 12, 2011) (Stewart, J.).

face."[31] Legal conclusions alone are not sufficient.[32] In considering a motion for judgment on the pleadings, "the court considers only the Complaint, the Answer, and the documents attached as exhibits to either."[33] In addition, the Court may consider "documents incorporated into the complaint by reference and matters of which a court may take judicial notice."[34]

## A.      Breach of Contract.

Route's breach-of-contract claim is based on enforcing the T&C's repressive and unprecedented restrictive covenants on Heuberger as a mere downloader of the App.[35] Heuberger was never in privity with Route, was never Route's merchant partner, had no previous employment relationship with Route, and never sold any business to Route.[36] As such, Route's breach-of-contract claim should be dismissed.

### 1.      The Restrictive Covenants Lack Consideration.

Contracts, and restrictive covenants specifically, must be supported by adequate consideration.[37] "[C]onsideration is defined as a benefit to a promisor or a detriment to a

---

[31] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

[32] *Id*. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

[33] *Prismview*, 2022 WL 103793, at *2.

[34] *Id*.

[35] Dkt. 2 ¶¶ 112-19.

[36] *Id*. ¶¶ 34, 40.

[37] *Sapp v. Casey Emp. Servs., Inc.*, 1989 WL 133628, at *5 (Del. Ch. Nov. 3, 1989); *Hensel v. U. S. Elecs. Corp.*, 262 A.2d 648, 651 (Del. 1970).

promisee pursuant to the promisor's request."[38]

Here, the express "purpose of the [T&C]…is to set for the terms and conditions under which Route" makes its "Internet website…and related software-as-a-service platform…available *to merchants* and the conditions under which *merchants* may have access to and use such Services and Content."[39] Notably, as it must, the Complaint pleads no benefit to Heuberger personally. Instead, the Complaint pleads that ElevatiONE—not Heuberger—was Route's merchant partner.[40] Any benefit from Route was exclusively for the benefit of ElevatiONE, and no consideration was exchanged between Route and Heuberger.[41] Because the restrictive covenants are unenforceable against the lone defendant Heuberger, the breach of contract claim should be dismissed.[42]

### 2. The Non-Competition and Non-Solicitation Provisions are Unenforceable.

Route has the burden of establishing its case by clear and convincing evidence.[43] Delaware courts do not "mechanically" enforce non-competes or non-solicitation

---

[38] *Jackson v. Carroll*, 643 F. Supp. 2d 602, 612 (D. Del. 2009).

[39] Dkt. 2, at 50, 60.

[40] *Id*. ¶¶ 34, 40.

[41] *Id*.

[42] *Hampton v. Utah Transit Auth.*, 2017 WL 3972488, at *5-6 (D. Utah Sept. 7, 2017) (dismissing breach of contract claim for lack of consideration); *Mortensen v. Dazet*, 2009 WL 1032800, at *4 (D. Utah Apr. 15, 2009) (granting motion to dismiss for lack of consideration).

[43] *Elite Cleaning Co. v. Capel*, 2006 WL 1565161, at *3 (Del. Ch. June 2, 2006) ("When seeking specific performance of a covenant not to compete, the plaintiff has the burden of establishing her case by clear and convincing evidence. Where a restriction on the ability to

provisions, but instead "carefully review the covenants to assure they '(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities.'"[44]

When assessing "reasonableness," courts analyze whether the restrictive covenant is "essential for the protection of the [enforcing party's] economic interests."[45] Ultimately, "a court of equity will not enforce [a restrictive covenant] if, on balance, to do so would impose an unusual hardship on [the target]."[46] Applying this balancing test, courts weigh the consideration received in exchange for the restrictive covenant before determining its reasonableness.[47] Courts also pay particular attention to "the temporal and geographic restrictions" within the covenant.[48] If the enforcing party overreaches with overbroad restrictions, courts readily decline enforcement.[49]

Here, Route seeks to enforce the following non-compete:

---

be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened.").

[44] *FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) ("When applying this balancing test, the court should take notice of the consideration an employee received in exchange for her promise not to compete before determining whether the non-compete is reasonable."); *see W.R. Berkley Corp. v. Niemela*, 2019 WL 5457689, at *6 (D. Del. Oct. 24, 2019).

[45] *Hamilton*, 2020 WL 1492783, at *6.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

> At all times during the Term and thereafter for a period of twenty four (24) months, You and Your subsidiaries and affiliates covenant and agree that You shall not provide Shipping Protection of any kind to any party **unless You or Your affiliates obtain all necessary and required licenses and permits** for such offering from all relevant federal and state agencies and regulatory bodies.[50]

First, Route's breach-of-contract claim fails from the outset because Route fails to allege breach. Route's T&C expressly allow a user to provide shipping protection if it obtains "***all necessary and required licenses and permits***."[51] Route admits that Navidium "does not offer actual insurance, nor is it licensed to do so," and also fails to allege that Heuberger is required to have any licenses or permits.[52] Indeed, Navidium does not offer shipping protection and, once installed, the technology is completely managed by merchants. That is, Heuberger effectively has all the licenses and permits he needs (*i.e.*, none), and Route fails to plead a breach.

Second, even if Route had alleged a breach, as pleaded, Route's non-compete is egregiously overbroad and serves no legitimate economic purpose. Delaware courts carve out a narrow list of legitimate business interests which companies may protect with restrictive covenants, none of which are present here. These include preserving employer

---

[50]   Dkt. 2 at 69 (emphasis added).

[51]   *Id*. (emphasis added).

[52]   *Id.* ¶ 44.

goodwill and protecting an employer's confidential information, including customer lists, pricing, trade secrets and proprietary information.[53]

Route's App is free for the (at least) tens of thousands of users like Heuberger that have downloaded the App. Although Route purports to be protecting confidential information, Route places no confidentiality restrictions on the use of its App.[54] Delaware courts enforce non-competes with nationwide scopes "only in instances where the competing party agrees, in connection with the sale of a business, to stand down from competing in the relevant industry…anywhere…for a stated period of time after the sale."[55] No business has been sold here, and Heuberger is not Route's former employee, rendering the non-compete unenforceable and unprecedented under these circumstances.[56]

---

[53] *Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016) (internal citation omitted); *see also Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 717-18 (N.D. Ill. 2014) (granting motion to dismiss and reasoning that "[c]ourts uphold only those noncompetition agreements which protect the employer's legitimate proprietary interests and not those whose effect is to prevent competition per se. . . . According to the terms of the clause, Miessen is similarly barred from working for any competitor, even if she was employed in a noncompetitive capacity. This fact, coupled with the almost limitless geographic scope of the clause, renders the clause unenforceable"); *see, e.g., MirTech Inc. v. AgroFresh Inc.*, 561 F. Supp. 3d 447, 454 n. 3 (D. Del. 2021) (explaining that under Delaware law, restrictive covenants, like a non-compete agreement, "must be reasonable in scope and duration," "advance a legitimate economic interest" of the former employer, and "survive a balance of the equities").

[54] *See infra* Section I.D.

[55] *Hamilton*, 2020 WL 1492783, at *7.

[56] Heuberger has been unable to locate any analogous authority—outside the context of a former employee—where restrictive covenants like Route's are held to be enforceable.

Route's non-solicitation provision is likewise unenforceable. The non-solicitation provision purportedly obligates Heuberger, for twenty-four months after he stops using the App, to not "for any reason, whether directly or indirectly, (i) solicit, recruit, or encourage any Route customer, employee, or consultant to reduce, alter, or terminate its relationship with Route or (ii) divert any potential Route customer away from Route."[57] First, Route's desire to eliminate competition from small merchants is not a legitimate economic interest justifying enforcement of the non-solicitation provision.[58]  Route does not allege that Heuberger had access to confidential information regarding its customers.[59]  In fact, Route does not (and cannot) allege that Heuberger had *any* information about, or access to, its customers. In the absence of any legitimate interest, the non-solicitation provision is enforceable as a matter of law.

Second, even if the non-solicitation provision was justified by a legitimate business interest—which it is not—the non-solicitation provision is unreasonable in scope.[60]  A two-year duration restricting solicitation "anywhere in the world" is unreasonable on its face and unlawfully infringes on Heuberger's right to pursue his

---

[57]  Dkt. 2 at 69.

[58]  *See, e.g., RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001) (concluding that "in the market for home inspection services, a two year restriction on a former employee soliciting business from his former employer's referral network is unreasonably long. A period of two years is quite simply not necessary to protect RHIS's legitimate interests in its good will and could unreasonably burden competition in the home inspection services market").

[59]  Dkt. 2 at 69.

[60]  *Boyce*, 2001 WL 1192203, at *7.

business interests and make a living.[61] Furthermore, Route previously argued the provision should be enforceable because it "would only apply to merchant partners who decide to pivot and go into the shipping insurance and protection business."[62] That is, Route *admits* that it is trying to suppress legitimate competition. Enforcing restraints on trade like those in Route's T&C—on every downloader and user of an App—would be unprecedented, extraordinary, and would have significant antitrust implications if permitted.

### 3. The Restriction on Use of Services and Development is Unenforceable.

Route's indefinite restriction on use of services and development provides that:

> You are strictly prohibited from accessing and/or using the Services or any Content to develop, or have a third party develop, a product or service that is similar or competitive to the Services, including but not limited to any product or service that offers or makes available shipping insurance to its customers.[63]

---

[61] *EBP Lifestyle Brands Holdings, Inc. v. Boulbain*, 2017 WL 3328363, at *8 n.43 (Del. Ch. Aug. 4, 2017) (explaining in dicta that while the court's decision was limited to the personal jurisdiction issue, under Rule 12(b)(6), the court "would likely still conclude that the non-compete clause was unreasonable in scope and duration and, therefore, void under Delaware law," when the non-compete provided "the non-compete clause prohibits [defendant] from 'engag[ing]' in the design, manufacture, sale, distribution or marketing of juvenile or infant products of any kind' 'anywhere in the world' for a period of two years after the disposition of his shares").

[62] Dkt. 68 at 16.

[63] Dkt. 2 at 52.

The Complaint's allegations negate Route's argument that Heuberger breached the restriction on use of services and development.[64] Instead, Route expressly **_admits_** that the two apps have "significant differences" including: (1) Navidium does not offer actual insurance, nor is it licensed to do so; (2) Navidium does not offer analyses or services regarding the amount of premium to charge to end-consumers, handle claims, or Route's other services; and (3) "Navidium offers merchants the option of 'white-labeling' its shipping protection product by removing the Navidium name on their websites and replacing it with whatever the merchant chooses."[65] By highlighting the "significant differences" between its App and Navidium, Route has pleaded itself out of a viable claim under the T&C's use of services and development provision.

### 4.    The Non-Disparagement Clause is Unenforceable.

Route's non-disparagement clause provides that: "[a]t all times during the Term and thereafter, neither Party will, whether directly or indirectly, make any disparaging, negative, or false or misleading statements with respect to the other Party."[66] Because enforcing this provision is unlawful and Route cannot plausibly allege that Heuberger's statements breached the non-disparagement clause, this claim should be dismissed.

---

[64]    _Id._ ¶¶ 43-45, 48. _See generally Dunn v. FastMed Urgent Care, P.C._, 2019 WL 4131010, at *7 (Del. Ch. Aug. 30, 2019) (failing to plead a breach warrants dismissal of a claim alleging breach of the implied covenant of good faith and fair dealing).

[65]    _Id._

[66]    _Id._ at 52.

First, Route cannot ask this Court to enforce a provision in violation of the Consumer Review Fairness Act ("CRFA").[67] The CRFA protects consumers' rights to post reviews[68] and voids form-contract provisions that restrict a "performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person," which is exactly what Heuberger allegedly did.[69] Accordingly, the non-disparagement clause is unenforceable as a matter of law.[70]

Second, Route fails to allege a breach because Heuberger's comments about his personal experiences with Route are objectively either substantially true or are statements

---

[67] *Tiffany v. Boatman's Sav. Inst.*, 85 U.S. 375, 385 (1873) ("[A] contract to do an act forbidden by law is void, and cannot be enforced in a court of justice."); *Preferred Fin. Servs., Inc. v. A & R Bail Bonds LLC*, 2018 WL 587023, at *6 (Del. Super. Ct. Jan. 26, 2018) ("This Court will not enforce a contractual agreement that is founded upon a violation of the law.").

[68] *See* 15 U.S.C. § 45b, subd. (a)(2); *see also* 15 U.S.C. § 45b, subd. (b)(1); Press Release, U.S. Senate Committee on Commerce, Science & Transportation, Senate Sends Legislation Protecting Consumer Reviews to President (Nov. 28, 2016), https://www.commerce.senate.gov/public/index.cfm/2016/11/senate-sends-legislation-protecting-consumer-reviews-to-president.

[69] *CrowdStrike, Inc. v. NSS Labs. Inc.*, 2017 WL 588713, at *5 (D. Del. Feb. 13, 2017) (citing 15 U.S.C. § 45b and explaining that "the public has a very real interest in the dissemination of information regarding products in the marketplace"); *see also* Fed. Trade Comm'n, *Consumer Review Fairness Act: What Businesses Need to Know*, https://www.ftc.gov/business-guidance/resources/consumer-review-fairness-act-what-businesses-need-know (last accessed Aug. 8, 2022) ("The [CRFA] protects people's ability to share their honest opinions about a business's products, services, or conduct, in any forum, including social media. . . . The [CRFA] was passed in response to reports that some businesses try to prevent people from giving honest reviews about products or services they received.").

[70] *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) ("Under Delaware common law, contracts that offend public policy or harm the public are deemed void, as opposed to voidable."); *Kennedy v. Murdick*, 5 Del. 458, 458 (Del. Super. Ct. 1854) ("Contracts in contravention of public policy, or of a public statute, are illegal, and will not be enforced.").

of opinion, which cannot be defamatory as a matter of law.[71] As such, any alleged breach of the non-disparagement clause should be dismissed.

## B. Commercial Disparagement/Trade Libel/Injurious Falsehoods and Defamation Per Se Claims.

Route fails to state a claim on its "interchangeable" defamation-related claims because the allegedly defamatory statements are either substantially true or are matters of opinion.[72] "Whether a statement is capable of sustaining a defamatory meaning is a question of law to be decided by the Court."[73] "[W]hether a publication is materially false requires examination of the published statements in context, not in isolation."[74]

Delaware follows the Restatement (Second) of Torts when analyzing injurious falsehoods claims, and Section 623A of the Restatement provides:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.[75]

---

[71] Dkt. 4-1 ¶ 24, Ex. 3; *see also* Dkt. 45 ¶ 62. *Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638, 647 (D. Del. 2003); *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998).

[72] Dkt. 2 ¶¶ 63-67.

[73] *Hogan v. Winder*, 2012 WL 4356326, at *7 (D. Utah Sept. 24, 2012) (Stewart, J.) (granting judgment on the pleadings and further reasoning that "[b]ecause expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability" (internal citations omitted)).

[74] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017).

[75] *In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020); Restatement (Second) of Torts § 623A (1977).

Delaware courts use a four-part test to determine whether the average reader would view a statement as one of fact or one of opinion: (1) the common usage or meaning of the challenged language; (2) whether the statement can be objectively verified as true or false; (3) the full context of the statement; and (4) the broader social context into which the statement fits.[76] Additionally, "[a] pure statement of opinion is constitutionally protected and cannot be a defamation as a matter of law."[77] "Tort liability does not attach to hyperbole and name calling at common law and under First Amendment principles. Insult and critique are different from palpable false statements of fact."[78]

Truth, and even "substantial" truth, is an affirmative defense to a defamation action.[79] When a statement is "substantially true," "no libel has occurred where the statement is no more damaging to plaintiff's reputation in the mind of the average reader than a truthful statement would have been. Moreover, immaterial errors do not render a statement defamatory if the 'gist' or 'sting' of the statement is true."[80]

Route alleges the following communications from Heuberger are defamatory: (1) March 2, 2022 communication with "Merchant 1"; (2) March 20, 2022 communication with "Merchant 2"; (3) March 29, 2022 communication with "Merchant 3"; (4) March

---

[76]  *Riley v. Moyed*, 529 A.2d 248, 251-52 (Del. 1987).

[77]  *Gill*, 294 F. Supp. 2d at 647.

[78]  *Cousins v. Goodier*, 2021 WL 3355471, at *3 (Del. Super. Ct. July 30, 2021).

[79]  *Agar v. Judy*, 151 A.3d 456, 485 (Del. Ch. 2017).

[80]  *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998).

29, 2022 communication with "Merchant 4"; and (5) an April 5, 2022 demo of the Navidium product for a Route employee.[81] All of these communications—with the exception of the surreptitious April 5, 2022 recording—are on file with Court and are central to Route's allegations; therefore, they can be considered on a motion for judgment on the pleadings.[82]

The defamation allegations rely on cherry-picked words or phrases that distort the full context of the communication.[83] Objectively, each allegedly defamatory statement is either substantially true and/or is blatantly an opinion based on Heuberger's experience when using the App.[84] Because Heuberger's statements were not false and did not extend beyond his personal opinions, Route's defamation claim fails.

The allegations regarding the April 5, 2022 recording likewise fail to state a claim. Route alleges its employee "setup a demo" with Heuberger and recorded the presentation *after* Route sent its March 30, 2022 cease-and-desist letter,[85] which was obviously for reconnaissance purposes. Because Heuberger's communication was to a Route employee, the communication was not to a third-party, but rather, was to Route itself and thus

---

[81]   Dkt. 2 ¶¶ 63-67.

[82]   Dkt. 4-1 ¶ 24, Ex. 3. *Prismview*, 2022 WL 103793, at *2.

[83]   Dkt. 45 ¶ 62.

[84]   *Id.*

[85]   Dkt. 2 ¶ 67; *see also* Dkt. 4-1, Ex. 14.

cannot be defamatory as a matter of law.[86] Moreover, during the demo, Heuberger allegedly "echoed [only] *the same* disparaging, false, and/or misleading claims made in his emails" to Route's customers.[87] Therefore, for the same reasons as the other allegedly defamatory statements fail to state a claim, so too does the April demo presentation.[88]

Moreover, in Route's most recent submission to the Court, Route pointed to only two examples of Heuberger's allegedly false statements—those regarding Route's requirement of filing of police reports and collecting customer data—thereby conceding that any remaining statements as pleaded are not actionable.[89] Route argued that Heuberger spread a lie that Route requires merchant customers to file police reports before a claim is approved for a lost package.[90] Although Route's Complaint pleaded that "it *never* requires a police report for a claim regarding a lost package,"[91] Route's submissions to the Court concede that it requires "the filing of a police report when a package is *stolen*."[92] Route's website, however, contradicts this and instead confirms that "[i]f an order is being reported as anything other than delivered for an unreasonable

---

[86]  *Agar*, 151 A.3d at 470 ("To state a claim for defamation, a plaintiff must plead (i) the defendant made a defamatory statement, (ii) concerning the plaintiff, (iii) the statement was published, and (iv) a third party would understand the character of the communication as defamatory.").

[87]  Dkt. 2 ¶ 67 (emphasis added).

[88]  *Id*. ¶¶ 63-66, 120-27.

[89]  Dkt. 68 at 18-19.

[90]  Dkt. 68 at 18.

[91]  Dkt. 2 ¶ 76 (emphasis in original).

[92]  Dkt. 68 at 18-19 (italics in original).

amount of time, we can safely conclude that the item is *lost*," and "[d]epending on the situation, you may need to file a police report with your local police department,"[93] and "[a]t our discretion, Route may require a *valid* police report when the customer's package is marked as delivered and not received."[94] Heuberger spoke the truth: Route requires customers to file police reports for lost ***and*** stolen packages.[95]

Finally, Route's cherry-picked statements regarding "customer data"—the full context of which are contained in Route's sworn affidavits and are cited in Defendants' opening brief—are true statements describing how the App operates or are opinions based on Heuberger's personal experiences.[96] A careful analysis of Route's injurious falsehoods claim should result in its dismissal.

---

[93]   Route, https://shoppers.help.route.com/hc/en-us/articles/6027029523607-My-Package-is-Missing-Is-it-Lost-or-Stolen- (last visited Aug. 9, 2022) (emphasis added).

[94]   Route, https://shoppers.help.route.com/hc/en-us/articles/6024555172631-How-to-File-a-Police-Report (last visited Aug. 9, 2022) (emphasis in original).

[95]   *In re Hydroxycut Mktg. & Sales Pracs. Litig.*, 810 F. Supp. 2d 1100, 1115 (S.D. Cal. 2011) (Rule 12 motion where portions of company's website were deemed authentic and admissions); *United States v. Ahidley*, 486 F.3d 1184, 1192 (10th Cir. 2007) (courts "take judicial notice of publicly-filed records in…court…concerning matters that bear directly upon the disposition of the case"); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

[96]   Dkt. 4-1 at 65, 70-71; Dkt. 45 ¶ 62. *See Winn v. Bank of Am.*, 2012 WL 27640, at *1 (D. Utah Jan. 4, 2012) (Stewart, J.) ("In considering the adequacy of plaintiff's allegations in a complaint subject to a motion to dismiss, a district court not only considers the complaint, but also 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" (citation omitted)).

### C.     Tortious Interference with Contractual Relations.

Route fails to plead a viable claim for tortious interference with contractual relations. The elements of a claim for tortious interference are: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[97] "A third party's lawful termination of a contract with the plaintiff will not, of itself, bar a claim that the defendant tortiously interfered with that contract."[98] "The focus of a claim for tortious interference with contractual relations is upon the defendant's wrongful inducement of a contract termination, not upon whether the termination itself was legally justified."[99] "In this context, Delaware courts have consistently followed the Restatement (Second) of Torts, which recognizes a claim for tortious interference with contractual relations where the defendant utilizes 'wrongful means' to induce a third party to terminate a contract."[100]

Route alleges that Heuberger interfered with "Route's contractual relations through improper means by: (a) using Route's confidential and sensitive information and

---

[97]   *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

[98]   *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010).

[99]   *Id*.

[100]  *Id*.; *see also* Restatement (Second) of Torts § 768 (1979) cmt. e. (explaining "wrongful means" as physical violence, fraud, civil suits and criminal prosecutions as wrongful and noting that, on the other hand, the actor may use persuasion and he may exert limited economic pressure. Subject to creating or continuing an unlawful restraint of trade, he may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor, or he may refuse other business transactions with the third person relating to that business).

trade secrets to develop Navidium in violation of Route's Terms and Conditions and trade secrets laws; and (b) engaging in commercial disparagement against Route in violation of common law."[101] None of the instances of allegedly wrongful conduct rise to the level of "improper means" for purposes of a tortious interference claim. Only "physical violence, fraud, civil suits and criminal prosecutions, are…wrongful" in the context of a tortious interference claim, none of which are alleged by Route.[102] "Persuasion," Heuberger's *modus operandi*, is expressly permitted.[103] "Competition is a necessary or desirable incident of free enterprise," and "[i]f the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged" such that there is no "wrongful inducement."[104]

Though "[f]raudulent misrepresentations are…ordinarily a wrongful means of interference and make an interference improper," Route never pleaded fraudulent misrepresentation.[105] Moreover, while a fraudulent misrepresentation "may" invoke liability "under the rules relating to defamation," defamation does not necessarily engender a tortious interference claim.[106]

---

[101]  Dkt. 2 ¶ 133.

[102]  Restatement (Second) of Torts § 768 cmt. e (1979).

[103]  *Id.*

[104]  *Id.*

[105]  Restatement (Second) of Torts § 767 cmt. c (1979).

[106]  *Id.*

Additionally, even assuming *arguendo* that Heuberger used Route's confidential information to develop the Navidium technology, such an assertion is irrelevant with respect to satisfying any elements of a tortious interference claim, especially because Route specifically pleaded that Navidium is different from its App in various ways.[107] What Route mischaracterizes as "commercial disparagement" is really the privileged conduct of fair competition,[108] and there is no allegation that Heuberger **wrongfully induced** a merchant to terminate its contract with Route.[109] For these reasons, Route fails to state a claim for tortious interference.[110]

### D.     Misappropriation of Trade Secrets.

Route's state and federal misappropriation of trade secrets claims fail because Route has not identified any information that qualifies as a trade secret and has not alleged that such trade secrets are subject to a confidentiality agreement.

The DTSA requires that "a plaintiff must identify a trade secret with sufficient particularity so as to provide notice to a defendant of what he is accused of

---

[107]   Dkt. 2 ¶¶ 44-45, 48.

[108]   *Id.* ¶¶ 63-67; Dkt. 4-1 ¶ 24, Ex. 3; Dkt. 45 ¶ 62; *see Bohatiuk v. Delaware Chiropractic Servs. Network, LLC*, 1997 WL 34615032, at *3 (Del. Super. Ct. Apr. 11, 1997) ("The term 'privilege' has the same meaning as 'with justification' or 'not improper' as used in connection with claims of tortious interference with contractual relations."); *see also* Restatement (Second) of Torts § 768 (1979) cmt. e. ("[C]ompetition is a necessary or desirable incident of free enterprise."); *supra* Section II.B.

[109]   *See generally* Dkt. 2.

[110]   *Smart Surgical, Inc. v. Utah Cord Bank, Inc.*, 2021 WL 734954, at *3 (D. Utah Feb. 25, 2021) (Stewart, J.) (dismissing tortious interference claim on a motion for judgment on the pleadings).

misappropriating and for a court to determine whether misappropriation has or is threatened to occur."[111]  To state a claim under the DTSA, a plaintiff must allege: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce'; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret."[112]

Under the statute, a trade secret is defined as information that: (i) "the owner thereof has taken reasonable measures to keep…secret;" and (ii) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of [such] information."[113]  "Misappropriation" is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or the "disclosure or use" of the trade secret by "improper means," including "theft, bribery, misrepresentation, breach or

---

[111] *Flexible Techs., Inc. v. SharkNinja Operating LLC*, 2019 WL 1417465, at *2 (D. Del. Mar. 29, 2019).

[112] *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (quoting 18 U.S.C. §§ 1836-39).

[113] 18 U.S.C. § 1839(3).

inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."[114]

Similarly, the DUTSA defines trade secret misappropriation as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or alternatively, the "[d]isclosure or use of a trade secret of another without express or implied consent" by a person who either: (1) acquired the secret by improper means; (2) knew or had reason to know that their knowledge of the trade secret was (A) derived by another who acquired it by improper means, (B) "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use," or (C) acquired by accident or mistake.[115] The determination of whether a plaintiff has established a *prima facie* trade secret misappropriation claim under the DUTSA implicates the following inquiries:

> (1) Does a trade secret exist, *i.e.*, have the statutory elements—commercial utility arising from secrecy and reasonable steps to maintain secrecy—been shown; (2) has the secret been communicated by plaintiff to the defendant; (3) was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) has the secret information been improperly (e.g., in breach of the understanding) used or disclosed by the defendant to the injury of the plaintiff?[116]

---

[114]  18 U.S.C. § 1839(5), (6).

[115]  Del. Code tit. 6, § 2001(2)-(4).

[116]  *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 (D. Del. 2008) (dismissing claim under DUTSA).

Here, Route has not identified a single, protectable trade secret. Instead, Route offers that its trade secrets are "the design, specifications, components, functionality or operation, and payment terms and pricing of Route's products and services, as well as actual application code."[117] These "broad categories of information" fail to sufficiently identify any trade secret that was allegedly misappropriated as a matter of law.[118]

The "design and function" of the App's toggle button is hardly a trade secret. Enabling customers to toggle between "on" and "off" for shipping insurance is on display for all to see, and the Court can take judicial notice that toggle buttons are extensively used, especially in online eCommerce applications and electronics.[119] Finally, regarding pricing, Route never alleged that Heuberger is using Route's pricing information.[120] Rather, Route alleges that Defendants "had access" to such information.[121] Setting "prices as a percentage of the customer's cart" is not confidential or proprietary.

---

[117] Dkt. 2 ¶ 23; *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *6-8 (D. Del. Jan. 12, 2021), *report and recommendation adopted*, 2021 WL 327388 (D. Del. Feb. 1, 2021) (granting motion to dismiss DTSA claims and noting that "Defendants' motion to dismiss pointed out that screenshots and videos of YouMap's visual design had already been disclosed to the public in Rally's social media posts before any trade secrets are alleged to have been appropriated by Defendants," and that "Plaintiff is required to state what the trade secrets are—*e.g.,* source code, algorithms, visual design aspects, or something else—in sufficient detail to put Defendants on notice of what they are accused of misappropriating and for this Court to determine whether any misappropriation occurred").

[118] *Power Integrations, Inc. v. Silanna Semiconductor N. Am., Inc.*, 2020 WL 3508078, at *3 (D. Del. June 29, 2020) (granting motion to dismiss).

[119] *See, e.g.,* EcoCart, https://ecocart.io/ (last visited Aug. 12, 2022).

[120] Dkt. 2.

[121] *Id*. ¶ 37.

Moreover, Route's misappropriation claims generally rise and fall on the use of Route's source code, which Route voluntarily provides to merchants without a confidentiality agreement.[122] When Route installed the App on ElevatiONE's website, Route provided ElevatiONE with access to certain, limited source code. The only step Route purportedly used to maintain the confidentiality of its source code was its T&C.

Critically, although the T&C contain a variety of purported (and unenforceable) restrictions on use and covenants to restrain competition, the T&C **do not have a provision that restricts the sharing of allegedly confidential information**.[123] In its most recent submission to the Court, Route represented the following to be a "confidentiality provision": "You further acknowledge and agree that any information regarding the design, 'look and feel', specifications, components, functionality or operation and payment terms and pricing (if applicable) of our Services is considered our confidential and proprietary information (collectively 'Confidential Information')."[124] This language, however, does not contain a restriction that precludes a customer from sharing purportedly "Confidential Information" and therefore, the allegedly "Confidential Information" cannot be a trade secret because there have been no efforts to keep it confidential.[125] Because Route did not take reasonable—or any—steps to maintain

---

[122] Dkt. 2 ¶ 23.

[123] *See generally* Dkt. 2.

[124] Dkt. 68 at 22 n. 78.

[125] *See, e.g., Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 517-18 (S.D.N.Y. 2017) (holding that "regardless of whether a clickwrap license" is a reasonable way to protect the secrecy of

confidentiality, there can be no viable misappropriation claim **even if** Heuberger used the code.[126] Without restrictions, the customer's ability to share purportedly "Confidential Information" is unimpeded and the misappropriation claim fails as a matter of law.[127]

### E.    Contributory Trademark Infringement.[128]

Route fails to state a claim for contributory trademark infringement under the Lanham Act. "Contributory infringement occurs when the defendant either (1) intentionally induces a third party to infringe on the plaintiff's mark or (2) enables a third party to infringe on the mark while knowing or having reason to know that the third party is infringing, yet failing to take reasonable remedial measures."[129]

"When the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must 'consider the extent of control exercised by

---

plaintiff's information, "it is clear that [plaintiff's] Terms of Use agreement is not suitable for the task because it simply does not contain a confidentiality provision.").

[126] *See, e.g., CSS, Inc. v. Herrington*, 306 F. Supp. 3d 857, 876-79 (S.D.W. Va. 2018) (software provider's source code for its software programs was not a trade secret under the West Virginia Uniform Trade Secrets Act, as it was not the subject of efforts that were reasonable under the circumstances to maintain secrecy, where provider installed the source code files on clients' servers using its software for approximately 20 years, provider did not encrypt or password protect the source code, nor label it as confidential, and provider did not mandate any confidentiality requirements when it provided its clients with the source code, so that any company with a contract with clients, including competitors, could have accessed it).

[127] *See, e.g., Zalta*, 280 F. Supp. 3d at 517-18.

[128] Route previously limited its claim to the "enabling form" of contributory trademark infringement, failing to allege that Defendants exercised "direct control and monitoring" over the alleged infringers. Dkt. 68 at 23. In an effort to show that neither factor applies, Heuberger includes a comprehensive analysis for the Court.

[129] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013).

the defendant over the third party's means of infringement.'"[130] "For liability to attach, there must be '[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark.'"[131]

First, Route never alleges that Heuberger intentionally induced any third party to infringe on Route's mark.[132] Second, Route has not adequately alleged that Heuberger specifically knew of direct acts of infringement.

> It is not enough to have general knowledge that some percentage of the purchasers of a product or service is using it to engage in infringing activities; rather, the defendant must supply its product or service to identified individuals that it knows or has reason to know are engaging in trademark infringement.[133]

Route merely alleges that "Defendants knew Navidium clients were infringing on Route's marks because they confirmed and installed the clients' shipping protection widgets using the infringing marks."[134] Absent an allegation that Heuberger exercised "direct control and monitoring" over the infringing party, Route's claim against him fails.[135]

---

[130] *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007).

[131] *Id.*

[132] *YZ Prods., Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 765 (N.D. Cal. 2021).

[133] *1-800 Contacts*, 722 F.3d at 1253,

[134] Dkt. 2 ¶ 159.

[135] *Perfect 10*, 494 F.3d at 807 (affirming dismissal and explain that "that the defendants' credit card "network [was] not the instrument used to infringe Perfect 10's trademarks; that infringement occur[ed] without any involvement of [d]efendants and their payment systems"); *Redbubble* 545 F. Supp. 3d at 765.

Furthermore, Route has not alleged that Heuberger had "the power to remove infringing material from these websites or directly stop their distribution over the Internet."[136] In fact, Route alleges that "Navidium offers **merchants** the option of 'white-labeling' its shipping protection product by removing the Navidium name on their websites and replacing it with **whatever the merchant chooses**, such that the end user…cannot be certain the shipping product being used belongs to Navidium."[137] Without a requisite level of control, Route's claim against Heuberger fails.[138]

## CONCLUSION

For the foregoing reasons, Heuberger requests that the Court grant his Motion. Respectfully submitted this 7th day of October 2022.

> FOX ROTHSCHILD LLP
> Ellie J. Barragry
> Richard I. Scharlat
>
> CLYDE SNOW & SESSIONS
>
> /s/ Walter A. Romney, Jr.
> Walter A. Romney, Jr.
>
> **Attorneys for Defendant Marc Heuberger**

---

[136] *Perfect 10*, 494 F.3d at 807.

[137] Dkt. 2 ¶ 48 (emphasis added).

[138] *Perfect 10*, 494 F.3d at 807.

## CERTIFICATE OF COMPLIANCE

I, Walter A. Romney, Jr., in accordance with DUCivR 7-1(a)(5), certify that this document contains 7,661 words and complies with DUCivR 7-1(a)(4).

*/s/ Walter A. Romney, Jr.*
Walter A. Romney, Jr.

## CERTIFICATE OF SERVICE

I, Walter A. Romney, Jr., an attorney, certify that on October 7, 2022, I caused the foregoing document to be filed in the above-captioned matter via the CM/ECF system, and served via electronic mail upon the following:

Jess M. Krannich
Chris Mack
Jon Collier
KIRKLAND & ELLIS LLP
Jess.krannich@kirkland.com
Jon.collier@kirkland.com
Chris.mack@kirkland.com

*/s/ Walter A. Romney, Jr.*
Walter A. Romney, Jr.